C-570-980
REM - Slip Op. 20-23 CIT 18-00184
4th AR Remand
01/01/2015 – 12/31/2015
**Public Document**
E&C/OVII:  MEH

## FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

### *Canadian Solar Inc., et al. v. United States*
### Consol. Court No. 18-00184; Slip Op. 20-23 (CIT February 25, 2020)

**A.      SUMMARY**

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (the Court) in *Canadian Solar Inc., et al. v. United States*, Consol. Court No. 18-00184,

Slip Op. 20-23 (CIT February 25, 2020) (*Remand Order*).  These final results of redetermination

concern *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,*

*from the People's Republic of China:  Final Results of Countervailing Duty Administrative*

*Review; 2015*, 83 FR 34828 (July 23, 2018) (*Final Results*) and accompanying Issues and

Decision Memorandum (IDM), as amended by *Crystalline Silicon Photovoltaic Cells, Whether*

*or Not Assembled Into Modules, from the People's Republic of China:  Amended Final Results of*

*Countervailing Duty Administrative Review; 2015*, 83 FR 54566 (October 30, 2018) (*Amended*

*Final Results*).  The petitioner is SunPower Manufacturing Oregon, LLC.  The respondents

selected for individual examination in the review are Changzhou Trina Solar Energy Co., Ltd.

and its cross-owned affiliates (Trina Solar), and Canadian Solar Inc. and its cross-owned

affiliates (Canadian Solar).[1]

---

[1] *See Certain Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Preliminary Results of Countervailing Duty Administrative Review, and Rescission of Review, in Part; 2015*, 83 FR 1235 (January 10, 2018) (*Preliminary Results*), and accompanying Preliminary Determination Memorandum (PDM).

Pursuant to the Court's *Remand Order*, we have clarified or reconsidered the *Final Results* regarding the issues analyzed below.  Based on the analysis below, we have:  (1) found the EBCP program to be non-used; (2) offered additional explanation regarding the specificity of aluminum extrusions provided at less than adequate remuneration (LTAR); (3) revised our benchmarks used in the benefit calculations for the provision of aluminum extrusions at LTAR; (4) offered additional explanation regarding our conclusion that the polysilicon market in China is distorted through the interference of the Government of China (GOC) and that, as such, we cannot rely on prices for polysilicon imported into China; (5) redetermined international freight costs by averaging Maersk data used in the final results with Xeneta data on the record; (6) fixed a translation error in electricity tariff schedules on the record; and (7) offered additional explanation regarding our conclusion that the provision of electricity for LTAR is specific.  We have revised the applicable subsidy rates accordingly.

## B.    BACKGROUND

On February 25, 2020, the Court sustained, in part, and remanded, in part, aspects of the *Final Results*.  In the *Final Results*, Commerce relied on adverse facts available (AFA) in finding that both respondents benefited from the EBCP given the GOC's failure to cooperate.  Specifically, Commerce determined that the program was used, despite certifications from the respondents' U.S. customers claiming non-use, because the GOC failed to provide an adequate explanation of the operation of the program, information concerning the disbursement of funds and credits through third-party banks, and the 2013 revisions to the administrative rules regulating the program.[2]  Commerce also countervailed the provision of aluminum extrusions (*i.e.*, the aluminum used to frame completed solar modules) and crystalline polysilicon (the

---

[2] *See* PDM at 28-29.

silicon ingots that are sliced into wafers that form solar cells) for LTAR.  In finding the provision of aluminum extrusions to be countervailable, Commerce concluded that users of aluminum extrusions were limited in number and that the program was, therefore, *de facto* specific, in accordance with section 771(5A)(D)(iii)(I) of the Tariff Act of 1930, as amended (the Act).  In measuring the benefit from the provision of aluminum extrusions, Commerce averaged monthly Comtrade data and an annual value taken from an IHS Markit (IHS) report.  Commerce reasoned it was necessary to take both sets of data into consideration – the Comtrade data because it accounts for monthly price fluctuations and the IHS data because it is specific to solar frames.  In measuring the benefit from polysilicon, Commerce relied on a variety of third party "external" benchmark sources, rather than actual imports, because Commerce considers imports to be an "internal," tier one, benchmark and, thus, distorted like all other domestic polysilicon transactions in China as the result of the GOC involvement in that market.  In the LTAR calculations, Commerce relied on data from Maersk to determine the cost of ocean shipping.  Although Commerce had relied on an average of Maersk data and Xeneta data in the *Preliminary Results*, Commerce determined for the *Final Results* that it was unclear whether the Xeneta data included all relevant terminal handling charges.  Finally, Commerce determined that the provision of electricity was countervailable based on AFA, given the GOC's failure to provide all information requested regarding the derivation of electricity prices.  In measuring the benefit, Commerce relied on electricity schedules on the record that allegedly contained a mistranslated column heading.

Commerce requested a voluntary remand to address four of the above decisions.  Commerce did so in order to revise its explanations concerning the four decisions in accordance with revised explanations offered to the Court in other proceedings.  Specifically, Commerce

requested that the following decisions be remanded: the application of AFA to find that respondents used the EBCP, the determination that China's provision of aluminum extrusions is a specific subsidy, the averaging of the Comtrade data and the IHS data, and the determination that China's provision of electricity is a specific subsidy. Commerce requested remands of these decisions because nearly identical decisions involving very similar facts in prior reviews had already been remanded by the Court.[3]

In addition to granting the requests for voluntary remands, the Court concluded that, as in the prior review of this order, Commerce had inadequately explained how the polysilicon market in China is distorted through GOC intervention and how that distortion affects prices for imported products.[4] In addition, the Court found that Commerce had misinterpreted evidence regarding the inclusion of terminal handling charges in the Xeneta ocean freight data,[5] and that Commerce had erred in concluding not to fix an allegedly mistranslated heading on the GOC's electricity tariff schedules because the allegation had not been raised by Canadian Solar until its case brief.[6] Analysis and additional background concerning the seven issues is provided below.

In the course of reviewing Canadian Solar's argument regarding Commerce's conclusion that the central authorities of the GOC are responsible for setting electricity tariffs, the Court noted that Notices 748 and 2909 of the National Development and Reform Commission (NDRC) of the GOC were not attached to the U.S. government's submission and instructed Commerce to ensure they were, in fact, on the record. Commerce notes that Notice 748 can be found at

---

[3] *See, e.g.*, *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018) (*Changzhou 3rd Review 1st Remand Order*) (first remand of the third review of this order) and *Changzhou Trina Solar Energy Co., Ltd. v. United States*, Slip Op. 19-137 (CIT November 8, 2019) (*Changzhou 3rd Review 2nd Remand Order*) (second remand of the third review of this order).

[4] *See Remand Order* at 6 (citing *Changzhou 3rd Review 2nd Remand Order*, Slip Op. 19-137 at 20).

[5] *Id.* at 9.

[6] *Id.* at 11.

Exhibit II E.22 of the GOC's August 29, 2017, questionnaire response.[7]  Commerce placed

Notice 2909 on the record of this remand redetermination on April 13, 2020, and allowed parties

four days to provide new factual information in response, pursuant to 19 CFR 351.301(c)(4).[8]

The Court deferred a decision on Canadian Solar's argument until after Commerce completes the

remand redetermination concerning the specificity of the provision of electricity at LTAR

(discussed above).  Commerce notes, however, that additional reasoning regarding the

conclusion that the central government is the administering authority for electricity prices is

included in the discussion of the electricity specificity issue below.  Finally, the Court upheld

Commerce on several other decisions challenged by Canadian Solar.[9]

On May 29, 2020, Commerce issued Draft Remand Results, reprinted with minor

changes below.[10]  On June 12, 2020, Commerce received comments on the Draft Remand

Results from Canadian Solar, Trina Solar, and the petitioner.[11]  In addition, on June 12, 2020,

Canadian Solar submitted new factual information (NFI) regarding the geographic locations of

---

[7] An additional copy is also on the record.  *See* Additional Documents Memorandum at barcode 3669437-02 PDF 37-41.

[8] *See* Memorandum, "Remand of Fourth (2015) Review of Countervailing Duty Order on Photovoltaic Cells from China; *Canadian Solar Inc., et al., v. United States*, CIT No. 18-00184 (Slip Op. 20-23); Placing Notice 2909 on the Record," dated April 13, 2020.  Commerce overlooked the fact that a copy of this document was already on the record.  *See* Additional Documents Memorandum at barcode 3669437-02 at PDF 18-26.

[9] *See Remand Order* at 12, 14, and 16 (the correct sales denominator for subsidies received by certain cross-owned affiliates of Canadian Solar; Commerce's refusal to provide a benefit offset for inputs purchased at above benchmark prices; Commerce's refusal to grant Canadian Solar an entered value adjustment).

[10] *See* Draft Results of Redetermination Pursuant to Court Remand, *Canadian Solar Inc., et al. v. United States*, Consol. Court No. 18-00184; Slip Op. 20-23 (CIT February 25, 2020) (May 29, 2020) (Draft Remand Results).

[11] *See* Canadian Solar's Letter, "*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China:  Draft Remand Redetermination Comments*," dated June 15, 2020 (Canadian Solar Comments); Trina Solar's Letter, "*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China:  Comments on Draft Redetermination Pursuant to Court Remand*," dated June 12, 2020 (Trina Solar Comments); and Petitioner's Letter, "*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*:  Comments on Draft Results of Redetermination Pursuant to Court Remand, *Canadian Solar Inc., et al. v. United States*, Consol. Court No. 18-00184," dated June 12, 2020 (Petitioner Comments).

solar cell producers in China.[12]  Canadian Solar claimed it could not have known the information

was relevant until Commerce issued the Draft Remand Results.  Because Commerce did in fact

revise the basis for finding the provision of electricity for LTAR to be specific, concluding upon

remand that the program is regionally specific, we accepted the NFI and provided parties an

opportunity to submit additional NFI in response.  We received no such "rebuttal" NFI.

Our responses to all comments received follows the analysis section.

## C.    FINAL ANALYSIS

1.    Export Buyer's Credit Program (EBCP)

In the final results, Commerce concluded as AFA that the respondents benefitted from

use of the EBCP because the GOC withheld necessary information.  We made this determination

despite the submission of non-use certifications by the company respondents.  We found that we

could not rely on such certifications, given that the GOC failed to provide information that would

enable us to understand the operation of the program after the issuance of revised administrative

rules by the GOC in 2013.  However, subsequent to this determination in July 2018, the Court

rejected similar reasoning by Commerce in the prior (third review) of this order (as well as in

several other cases).[13]  In response, Commerce provided a more detailed explanation elaborating

---

[12] *See* Canadian Solar's Letter, "*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China:  Draft Remand Redetermination Comments*," dated June 15, 2020 (Canadian Solar Comments) (Canadian Solar Electricity NFI).

[13] *See Changzhou 3rd Review 1st Remand Order*, 352 F. Supp. 3d at 1326 ("Commerce provided reasoning as to why the GOC's failure to respond adequately made it impossible for it to understand fully the operation of the EBCP, but it failed to show why a full understanding of the EBCP's operation was necessary to verify non-use certifications."); *see also Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1271 (October 17, 2018) ("There is no ambiguity or uncertainty surrounding the use of the Program by Plaintiffs or their customers, as this information consisted of signed declarations from Plaintiffs' U.S. customers certifying non-used, and is corroborated by GOC's statements.  *See* GTC NSA Questionnaire Resp. at 13-14.  Therefore, the only gap of information on the record are facts regarding certain aspects of the *operation* of the Program.  In turn, the only factual issues potentially appropriate for facts otherwise available, § 1677e(a), and adverse inferences, § 1677e(b), are those that concern the operation of the Program, factors entirely irrelevant to Guizhou's apparent non-use."). *Cf. Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1355 (CIT 2016) (*Changzhou Investigation Remand Order*) (finding Commerce had offered a reasonable explanation that an understanding of how an exporter would be

on why exactly it was necessary to understand the operation of the EBCP in order to verify claims of non-use.[14]  Specifically, we explained that the GOC refused to provide Commerce with its 2013 administrative rules governing the program as well as a list of correspondent banks involved in the EBCP transactions.  We also noted the GOC's failure to provide other requested information, such as a sample application and other documents making up the "paper trail" of the provision of credit under the program.[15]  Absent this information, Commerce has no assurance of its ability to differentiate ordinary commercial lending from EBCP-supported credit in the books and records of the respondents' U.S. customers, or to differentiate disbursements of funds to the respondents themselves pursuant to ordinary lending from disbursements pursuant to EBCP-supported credit.  Additionally, Commerce has no guidance to follow in identifying which banks or loans to scrutinize in attempting to verify non-use.  Thus, attempting to verify non-use of the EBCP without knowing where to look, or what to look for, would be unlikely to yield accurate or meaningful results.  In the current litigation, Commerce requested a voluntary remand to provide the more detailed explanation to the Court.

After Commerce's request for a voluntary remand, but before the Court granted it, the Court issued a second ruling pertaining to the prior (third) review of this order in which the Court rejected Commerce's more detailed explanation.[16]  In addition, in granting the voluntary

---

involved in the program was necessary to determine usage and that the GOC had failed to cooperate in providing this information, and upholding the application of AFA in determining the respondent companies had used the program).

[14] *See, e.g.*, *Changzhou Trina Solar Energy Co., Ltd. v. United States*, Court of International Trade Consolidated Court No. 17-00198, "Final Results of Redetermination Pursuant to Court Remand," dated April 24, 2019 (barcode 3825109-01) (Changzhou 3rd Review 1st Remand Redetermination) at 12-24 and 42-59.

[15] *Id.* at 21.

[16] *See, e.g.*, *Changzhou 3rd Review 2nd Remand Order*, Slip Op. 19-137 at 8-9 ("The court cannot sustain Commerce's determination that verification would be impossible or unduly onerous.  Although Commerce has shown that the GOC failed to answer certain questions regarding the EBCP's operation, it is still not entirely clear to the court that the missing information is required to effectively verify respondent's non-use of the program.  In order to avoid unnecessarily impacting cooperating parties because of the GOC's failure to cooperate, Commerce needs to at least attempt to verify the certifications of non-use in this case.  *See Archer Daniels Midland Co. v. United States*,

remand request, the Court instructed Commerce to "consult these prior opinions and reevaluate its decisions on {the issues subject to the request},"[17] referring to both opinions issued pursuant to the third review litigation.  In doing so, the Court noted "{t}he administrative records of the Third and Fourth Administrative reviews and the government's legal rationales are similar and thus the determination at hand suffers from essentially the same deficiencies that the court has noted in these prior opinions."[18]  Thus, as the Court has made it clear that it finds Commerce's extended elaboration unavailing, Commerce is not repeating that statement in full again now in this specific remand redetermination.  We respectfully disagree with the Court that the record contains the information necessary to verify the EBCP accurately, or that any gaps could be filled by soliciting information from the respondents or their customers or by appealing to the GOC to provide alternative information; however, given the unique context surrounding this litigation and the Court's clear instruction to consult its prior opinions in issuing this remand redetermination, we are finding the program not used in this instance.  Commerce has performed numerous verifications over the years, and in our judgment, it is impossible to conduct a verification of the EBCP accurately and with confidence without the GOC's cooperation.  Given the (incomplete) information available to Commerce regarding the EBCP program and how it operates, Commerce does not believe the respondents or their U.S. customers – who claim not to have benefitted from the program and, thus, presumably, are not very familiar with the program

---

917 F. Supp. 2d 1331, 1342 (CIT 2013) (noting that Commerce should 'seek to avoid' adversely impacting a cooperating party).  There appears to be enough information on the record for Commerce to identify potential suspect financial entries.") and *Guizhou Tyre Co., Ltd. v. United States*, 399 F. Supp. 3d 1346, 1353 (August 21, 2019) ("Commerce has failed to demonstrate why the 2013 EBCP rule change is relevant to verifying claims of non-use, and how that constitutes a 'gap' in the record.  Additionally, Commerce's anemic conclusion that verification of the non-use declarations would be unreasonably onerous is based on speculation that stems from the Department's own failure to 'clearly and adequately' request information to aid in its verification.").

[17] *Remand Order*, Slip Op. 20-23 at 5.
[18] *Id.*

– can substitute for the Chinese government and propose a reliable method for verifying non-use of the program.

2.   <u>Specificity of the Provision of Aluminum Extrusions</u>

In the *Final Results*, Commerce concluded that the provision of aluminum extrusions was specific, as such inputs were consumed by six "industries," *i.e.*, a limited number of actual recipients as defined under section 771(5A)(D)(iii)(I) of the Act, following a similar determination in the third review of this order.  In remanding that prior determination, the Court directed Commerce to explain how subsidizing six "broad" industries (*e.g.*, "building and construction") amounts to a specific, rather than a generally available, subsidy, paying particular attention to the composition of the six industries,[19] as well as the composition of the overall Chinese economy by comparison.[20]  Upon remand, Commerce provided additional explanation that the Court concluded was a reasonable basis for finding the program specific.[21]

Given that Commerce's analysis in the *Final Results* was nearly identical to the third review, Commerce requested a voluntary remand in order to offer the additional explanation here, as well.[22]  As such, Commerce continues to find the subsidy program *de facto* specific

---

[19] *See Changzhou 3rd Review 1st Remand Order*, 352 F. Supp. 3d at 1330-31.
[20] *Id.*
[21] *See Changzhou 3rd Review 2nd Remand Order*, Slip Op. 19-137 at 12.
[22] Information concerning the consumers of aluminum extrusions in China was not added to the record by any party during the administrative review (aside from a statement by the GOC that there are a "vast number of uses for aluminum extrusions").  Commerce's determination therefore relied on statements from the final issues and decision memorandum from the third review.  Commerce has now placed the relevant information from that review on the record of this review.  *See* Memorandum, "Remand of Fourth (2015) Review of Countervailing Duty Order on Photovoltaic Cells from China; *Canadian Solar Inc., et al., v. United States*, CIT No. 18-00184 (Slip Op. 20-23); Placing Aluminum Consumption Information on the Record," dated April 16, 2020 (Aluminum Extrusions Memorandum).  Commerce provided parties an opportunity to submit information in response.  We received such information from Canadian Solar, which placed on the record relevant excerpts from the GOC's questionnaire response in the fifth and six reviews (2016 and 2017) as well as several other exhibits concerning aluminum extrusions consumption.  *See* Canadian Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  NFI on Aluminum Consumption," dated April 29, 2020 (CS Aluminum Extrusions NFI).  We also received such information from the petitioner.  *See* Petitioner's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's

because the actual recipients of the subsidy are limited in number, within the meaning of section 771(5A)(D)(iii)(I) of the Act.

In the *Preliminary Results*, Commerce concluded that "{w}hile the GOC indicates aluminum extrusions are used in a variety of industries and sectors across China, we continue to find, consistent with the most recently completed review, that the industries within those sectors that actually consume aluminum extrusions are limited in number."[23]  What Commerce was attempting to say with its preliminary language was that, ultimately, it is the number and significance of the actual users of the input (*i.e.*, the actual recipients of the subsidy) that matter, not the breadth of the economic categories to which they belong.  For example, to use the hypothetical the Court presented in *Changzhou 3rd Review 1st Remand Order*,[24] suppose that the GOC had only two economic sectors, manufacturing and non-manufacturing, and the input under examination was used in both sectors.  On a certain level, such facts could be interpreted in either of two diametrically opposed ways:  (1) the subsidy is used by all sectors of the economy and, thus, there is 100 percent usage; (2) the subsidy is used by only two sectors of the economy and, thus, usage is limited and specific.  The Court expressed concern regarding the latter outcome, but Commerce must also be concerned with the former outcome.  If, to continue the hypothetical, there was only one relatively small user in each of the two sectors, despite usage being spread across "all sectors" of the economy, the actual consumption would be limited to a small subset of consumers within China.  In such a situation, despite being used in all sectors, the

---

Republic of China:  Response to Factual Information Regarding Aluminum Extrusions Consumption," dated April 29, 2020.
[23] *See* PDM at 35.
[24] *See Changzhou 3rd Review 1st Remand Order*, 352 F. Supp. 3d at 1330.

subsidy could not be considered widely used.  Upon remand, Commerce concludes that such a situation exists in the Chinese aluminum market.

Despite being used in six "broad" sectors of the Chinese economy, within each of the six categories previously delineated by the GOC, the number of actual users (as identified by the GOC) appear limited compared to the overall scope of the Chinese economy.  For example, as noted above, the GOC has reported that aluminum extrusions are used by the "building and construction" section of the Chinese economy, but it reports limited and rather specific applications within that category: "frames of doors and windows," "curtain wall," "structural frames," "bridges," and "guard bars."[25]  The list describes narrowly defined products that cannot reasonably be assumed to encompass anything close to all building and construction activity within China.  Likewise, under "machinery and equipment," the GOC lists only:  "elevator and escalator," "shield, handrail and terrace," "agricultural machinery," "radiator," and "shape-setting equipment and assembly-line equipment."[26]

This conclusion is not altered by the additional information placed on the record of this remand redetermination by Canadian Solar.  First, Commerce's specificity finding does not rest on the conclusion that the solar panel industry is a disproportionate or predominant consumer of aluminum extrusions and, thus, information to prove otherwise is not relevant to this finding.[27]  Second, although Canadian Solar's information expands the list of uses for aluminum extrusions, the list is still "primarily limited to a relatively narrow range of applications."[28]  Moreover, the applications included in that expanded list appear to fall within the same industries highlighted by the GOC in the prior review:  primarily automobile and aircraft production and public

---

[25] *See* Aluminum Extrusions Memorandum at PDF 5.
[26] *Id.*
[27] *See* CS Aluminum Extrusions NFI at 3.
[28] *See Changzhou 3rd Review 2nd Remand Order*, Slip Op. 19-137 at 12.

transportation.  For example, Exhibit 7 of Canadian Solar's submission, which it describes as a

"comprehensive list of aluminum extrusions" demonstrating the "wide variety of end-uses for

aluminum extrusions even within particular industries,"[29] includes "aerospace aluminum pipe

used in aircraft transportation pipeline," "aluminum tube shock absorbers for the automotive

industry," and "aerospace aluminum tubes for passenger seats."  All in all, Exhibit 7 includes

about 25 such very narrow applications, thus, a limited number of actual users.

It is not reasonable to conclude that the producers of the applications reported by the

GOC (and added to by Canadian Solar) constitute anything close to all manufacturing activity in

China (or even a broad swath of such activity).[30]  By comparison, the record indicates that

manufacturers in China produce at least the following products:  foods, beverages, tobacco,

textiles, apparel, leather products, furniture, paper and paper products, recording media, articles

for culture, education and sport activities, raw chemical materials and chemical products,

medicines, chemical fibers, rubber, plastics, mineral products, metal products, general purpose

machinery, special purpose machinery, transport equipment, electrical machinery and equipment,

computers and other electronic equipment, measuring instruments and machinery for cultural

activity and office work, and artwork.[31]  The fact that the limited number of users reported by the

GOC happen to be classified under six different and "broad" sectors of the Chinese economy,

while not entirely irrelevant, is not dispositive of whether the subsidy is specific; what matters

---

[29] *See* CS Aluminum Extrusions NFI at 3-4.

[30] *See* Aluminum Extrusions Memorandum at 5 (table listing applications under four broad categories that compare roughly to the six categories the GOC refers to elsewhere in its response).  In addition to the applications already mentioned under "construction" and "machinery and equipment," the GOC also reports:  automobile body frame, fuselage, "aerofoil," undercarriage, seat and guardrail; heat exchanger, direction-shift frame of automobiles and trucks, automobile sunroofs, direction-shift frame side stand, automobile doors and bumpers; heating, ventilation an A/C devices, solar panel illuminating system, ladders, woodworking, and mechanical platform.

[31] *See* Memorandum, "Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China:  Additional Documents Memorandum," dated February 5, 2018 (Additional Documents Memorandum) at barcode 3669437-01 PDF 3 (*China Statistical Yearbook*, National Bureau of Statistics China).

most is whether the users can be considered something akin to the whole of the Chinese economy.  Here, we find that usage is limited to certain enterprises involved in the production of the "applications" listed above.  Accordingly, the users of aluminum extrusions do not make up something akin to the whole of the Chinese economy, and we therefore find that their provision for LTAR is *de facto* specific because the actual recipients of the subsidy are limited in number.

3.    Commerce's Use of Comtrade and IHS Datasets as a Benchmark for Aluminum Extrusions

In *Changzhou 3rd Review 1st Remand Order*, the Court remanded Commerce's decision to average monthly Comtrade data with an annual IHS value in determining a benchmark for aluminum extrusions.  The Court expressed doubts that the Comtrade data (which reflect several types of aluminum extrusions) were specific enough to serve as an accurate benchmark for the aluminum solar frames at issue, or that there was a sufficient need for a monthly benchmark to warrant including the Comtrade data in the calculation despite being overly broad.[32]  In response, Commerce provided additional explanation regarding why the Comtrade data was not overly broad.  Commerce requested a voluntary remand to offer that explanation here as well.  However, before the voluntary remand was granted, the Court rejected the additional explanation, strongly suggesting Commerce rely only on the IHS data.[33]  Subsequently, in a second remand redetermination, under protest, Commerce recalculated the subsidy rate for the program relying only on the IHS data.

Although Commerce has a preference for relying on benchmark data that captures monthly price fluctuations, it is not possible to demonstrate that the monthly price fluctuations reflected in the Comtrade data are driven by variations in solar frame prices.

---

[32] *See Changzhou 3rd Review 1st Remand Order*, 352 F. Supp. 3d at 1331-33.
[33] *See Changzhou 3rd Review 2nd Remand Order*, Slip Op. 19-137 at 15.

Furthermore, given the fact that the record (here or in the third review) does not indicate what exactly is included in the HTS subheadings included in the Comtrade data, nor how solar frames may differ from other types of aluminum extrusions, it is likewise not possible to adequately address factors affecting comparability. As a result, we are relying solely on the IHS data as a benchmark for aluminum extrusions in this review, and have revised the subsidy calculations and rates accordingly.

4.   Specificity of Electricity Subsidy

In *Changzhou 3ʳᵈ Review 1ˢᵗ Remand Order*, the Court remanded Commerce's determination that the provision of electricity was specific based on AFA. The Court faulted Commerce for not explaining how the GOC's failure to provide information led to the specificity determination.[34] In response, Commerce determined the provision of electricity was specific to the solar industry. Commerce requested a voluntary remand to offer that explanation here, as well. However, before the voluntary remand was granted, the Court rejected the additional explanation.[35] Subsequently, in a second remand redetermination, Commerce revised its determination finding that the program was regionally specific under 771(5A)(D)(iv) of the Act. Below Commerce provides a revised determination also finding that the program was regionally specific under 771(5A)(D)(iv) of the Act.

There is no dispute that electricity prices vary from province to province in China.[36] What has been at issue in Commerce's numerous determinations where the provision of electricity is countervailed is why prices vary from province to province and who makes the decision – ultimately – to set or allow distinct prices in each province. Insofar as provincial

---

[34] *See Changzhou 3ʳᵈ Review 1ˢᵗ Remand Order*, 352 F. Supp. 3d at 1342-43.
[35] *See Changzhou 3ʳᵈ Review 2ⁿᵈ Remand Order*, Slip Op. 19-137 at 24.
[36] *See* GOC's August 29, 2017 QR at Exhibit II E.22.

governments are solely responsible for setting prices, it is possible that there is no basis for

finding the program regionally specific under section 771(5A)(D)(iv) of the Act, because all

recipients within the jurisdiction of the price setting authority would be paying the same prices;

thus, there would be no price discrimination on the part of the authority granting the subsidy.

However, insofar as the varying prices are set by authorities of the central government in

Beijing, and insofar as the GOC is unable to demonstrate that such variances are in accordance

with market principles or cost differences, there is, in fact, a regionally specific subsidy program,

because the central Beijing authority is setting different prices in different provinces without

explanation.

> The GOC has claimed:
>
> Electricity prices in China are based on market principles.  The relevant pricing authorities are required to take into account the overall demand and supply present in the electricity market, as well as the costs of electricity generation and transmission.  The retail prices of electricity consist of four parts:  purchasing cost, transmission prices, transmission losses, and governmental surcharges.  The differences in these costs as well as other costs like coal and coal transportation prices, among others, are analyzed mainly on an enterprise as well as provincial basis, and the provincial governments play a key role in collecting cost information formulating electricity prices for provincial are under its jurisdictions respectively.[37]

> However, the GOC refused to provide key information that would allow

Commerce to confirm its claims.  Specifically, the GOC did not provide:  the provincial

price proposals for each of the relevant provinces that might demonstrate that the

provinces are the authorities setting prices or that there are market- or cost-based reasons

underlying the variation in prices among provinces;[38] a detailed description of the cost

elements and price adjustments that were discussed between the provinces and the

---

[37] *See* GOC's August 29, 2017 QR at 77.
[38] *Id.* at 78-79.

NDRC, which might provide further evidence for determining which authority is setting prices and why different prices have been determined for different provinces;[39] and, province-specific explanations linking particular costs to retail prices, which, once again, might indicate whether there is a market- or cost-based explanation for the variation among provinces.[40]  Without such information, Commerce cannot confirm that market and commercial principles explain the variation in electricity prices on the record among provinces and cannot determine the price-setting authority.

In a change from prior reviews of this order, the GOC claims that, in April 2015, (*i.e.,* during the POR of this review) the NDRC's price setting authority was delegated to the provinces and provincial price proposals are, therefore, now unnecessary.  Thus, it concluded that the information requests described above were no longer applicable.[41]  In response, Commerce placed information on the record of the review that contradicted the GOC's claims.[42]  After explaining the significance of this information in the *Preliminary Results*,[43] we provided parties the opportunity to comment,[44] and the GOC provided nothing in response.  Thus, despite knowing that Commerce interpreted the information as indicating the NDRC continues to play a decisive role in setting and adjusting electricity prices, the GOC offered no comments to persuade us otherwise.[45]

---

[39] *Id.* at 80-81.
[40] *Id.* at 81-83.
[41] *See, e.g., id.* at 79-80 (response to question C).
[42] *See* Additional Documents Memorandum at barcode 3669437-02 PDF 1-118.
[43] *See* PDM at 26.
[44] *See* Additional Documents Memorandum at barcode 3669437-01 PDF 1.
[45] Commerce's memorandum gave parties seven days to submit "comments;" however, parties also would have been allowed to submit new factual information along with their comments pursuant to 19 CFR 351.301(c)(4).  Thus, the GOC could have provided additional documents to demonstrate the accuracy of its description of the supposedly new system.

Based on our examination of the additional documentation, as well as the GOC questionnaire response, we concluded the following demonstrated that the NDRC was still ultimately in control of the price setting system and that the 2015 changes had not affected how the system operated in practice:

- The NDRC's Notice 2909 of 2004 clearly demonstrates at Appendix I that the State Council and NDRC are ultimately in charge of electricity prices;[46] *e.g.*, "electricity price shall be set under a bidding system of grid access and a market-oriented linkage mechanism of coal and electricity prices, under the Scheme of Reform of Electricity Pricing issued by State Council" (Article II of Appendix I); the NDRC "shall implement coal-electricity price linkage by grid regions or price regions within a single grid region according to the change of average plate price, and shall reported and filed to the State Council" (Article IX of Appendix I); "the State Council shall authorize the National Development and Reform Commission according to the Price Law of the People's Republic of China to adopt price intervention measures when such sharp fluctuation occurs" (Article X of Appendix I).

- While the text of Notice 2909 does not appear to preclude delegation of the responsibilities described above to provincial governments, such responsibilities are still ultimately in the hands of the State Council and NDRC.  Nothing on the record indicates Notice 2909 has been superseded or repealed.[47]

---

[46] *See* Additional Documents Memorandum at barcode 3669437-02 PDF 23.
[47] Commerce specifically offered parties the opportunity during this remand redetermination to provide information concerning whether Notice 2909 was still operative law during 2015.

- The NDRC's Notice 748 of 2015 (the document that implements the new system) provides further support for the conclusion that the NDRC is still the price-setting authority;[48] *e.g.*, Article 1 states that prices for electricity uploaded to the grid from coal powered plants "are to be lowered nationwide for about 2 cents per kilowatt on average . . . .  The average adjustment levels of provinces (autonomous regions and municipalities) and adjusted coal power generation upload benchmark prices are listed in Annex I" (the annex referenced in this text lists prices that vary by province); Articles 2 through 4 require the reduction of electricity prices for industrial and commercial users.

- Importantly, Article 6 of Notice 748 requires the provinces to report their "plans" to the NDRC for the record, thus contradicting the GOC's claims that there are no longer "proposals" that can be provided to Commerce (unless the GOC is splitting hairs over the distinction between a plan and a proposal).[49]  Moreover, given the detailed instructions from the NDRC to the provincial governments in Notices 748 and 2909, it stretches credulity to suggest that the NDRC does not have some system in place to ensure the provincial plans are in compliance with its directives or that the provinces do not have to submit their plans for approval by the NDRC.

Therefore, Commerce concluded that the GOC's central government continues to be the price-setting authority.  Moreover, the GOC still has within its possession documentation that it could have provided in response to Commerce's requests indicating how exactly the varying provincial prices are established under the direction of the

---

[48] *See* Additional Documents Memorandum at barcode 3669437-02 PDF 37 (this notice was also placed on the record by the GOC in its August 29, 2017 QR at Exhibit II E.22).

[49] The two versions of Notice 748 on the record provide somewhat different translations of Article 6.  One (submitted by the GOC on the record of this review) uses the term "plan" and another uses the term "package."

NDRC – whether prices are set in accordance with normal market and commercial considerations and to what extent the NDRC might actually allow the provinces the discretion to set prices beyond Annex I of Notice 748.

Therefore, as AFA, Commerce determines that, contrary to the GOC's narrative, the provision of electricity is a countervailable subsidy program whereby the central Chinese government, through the NDRC in Beijing, sets different prices in different regions under its authority (*i.e.*, the provinces) without any commercial or market considerations, but instead for development purposes.  The amount of the subsidy we infer to be the difference between what the respondent is paying and the highest tariffs set for any province.  The facts support the inference that there is a regionally specific program wherein prices are set differently within the jurisdiction of the authority providing the subsidy.  As described above, the key directives of the price-setting system still originate with the NDRC (pursuant to Notices 748 and 2909) and, in fact, Annex I of the NDRC's Notice 748 provides what is at least a set of benchmark prices that vary by province.  Therefore, as AFA, we infer from the fact that the NDRC is significantly involved in the setting of electricity prices that the NDRC is the authority providing the subsidy. Moreover, the schedules submitted by the GOC constitute a clear factual basis for the inference that the NDRC has subsidized electricity consumers in certain regions by arbitrarily setting different prices across the provinces.[50]  Therefore, upon remand, we continue to find that the provision of electricity constitutes a countervailable subsidy program.

---

[50] *See* GOC's May 3, 2016 QR at Exhibit II.E.22.

5.    <u>Commerce's Rejection of Canadian Solar's Import Pricing Data in Computing a Benchmark Price for Polysilicon</u>

Following its decision in *Changzhou 3rd Review 2nd Remand Order*, the Court

remanded Commerce's decision in the *Final Results* that GOC intervention in the solar

grade polysilicon market has led to distortion in that market.[51]  The Court found that, as

in *Changzhou 3rd Review 2nd Remand Order*, Commerce did not sufficiently explain how

the GOC's minimal participation in the general polysilicon industry led to distorted prices

for imported solar-grade polysilicon.  The Court also noted it was unclear whether and

how the documents cited by Commerce rationally support the distortion finding, and

remanded the issue to Commerce with instructions to consider the Court's decisions in

*Changzhou 3rd Review 1st Remand Order* and *Changzhou 3rd Review 2nd Remand Order*.

In *Changzhou 3rd Review 1st Remand Order*, the Court remanded Commerce's

rejection of import data in determining a benchmark for solar grade polysilicon.

Commerce understood the Court's concern to be that it was unclear why prices for

imports should be considered "domestic prices" (*i.e.*, internal Chinese prices) and thus

rejected as a possible "tier 1" benchmark (*i.e.*, internal benchmark) given the distorted

market within China.[52]  In response, Commerce explained that prices for imported

products must compete with prices of products sourced domestically; thus, prices for

imported products are distorted along with domestic prices.[53]  Subsequently, in

*Changzhou 3rd Review 2nd Remand Order*, the Court explained that Commerce's decision

to resort to tier-two price information was not reasonable.  In response, Commerce

examined additional information on the record demonstrating a distorted market,

---

[51] *See* Remand Order at 7.
[52] *See* Changzhou 3rd Review 1st Remand Redetermination at 37.
[53] *Id.* at 38.

considered several factors beyond the GOC's ownership and control of polysilicon producers, and elaborated on how the information on the record leads to the distortion conclusion.[54]

Thus, in this remand redetermination, we are also undertaking a broader analysis of the solar grade polysilicon market and have concluded that other factors, in addition to the GOC's ownership and control of production, lead to the conclusion that the market is distorted. Before doing so, we placed relevant factual information on the record: the GOC's 12th Five Year Plan for the Solar Photovoltaic Industry and the 2013 annual report of GCL-Poly Energy Holdings Limited (GCL Poly), the largest Chinese solar-grade polysilicon producer.[55] We then provided parties an opportunity to provide additional information and comment on the issue.[56] On April 9, 2020, we received such information and comments from the petitioner and Canadian Solar.[57] On April 17, 2020, the petitioner placed information on the record in response to the April 9, 2020, submission of Canadian Solar.[58]

As noted in the *Preliminary Results*, while the GOC provided information indicating that it owns or controls producers accounting for eight percent of the

---

[54] *See, e.g.*, *Changzhou Trina Solar Energy Co., Ltd. v. United States*, Court of International Trade Consolidated Court No. 17-00198; Slip Op. 19-137 (CIT November 8, 2019), "Final Results of Redetermination Pursuant to Court Remand," dated February 28, 2020 (barcode 3948966-01) (Changzhou 3rd Review 2nd Remand Redetermination) at 14-22 and 34-41.

[55] *See* Memorandum, "Reopening the Record and Opportunity to Comment," dated April 1, 2020 (Polysilicon NFI Memorandum).

[56] *See id.*

[57] *See* Petitioner's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Submission of Information and Comments Concerning the Polysilicon Market in China," dated April 9, 2020 (Petitioner Polysilicon NFI), and Canadian Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Responsive Comments and New Factual Information on Polysilicon," dated April 9, 2020 (CS Polysilicon NFI).

[58] *See* Petitioner's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Rebuttal Information and Comments Concerning the Polysilicon Market in China," dated April 17, 2020 (Petitioner Polysilicon NFI).

production of polysilicon,[59] it was unable to provide information specific to solar-grade polysilicon (just as solar glass constitutes a particular type of flat glass, solar-grade polysilicon constitutes a particular type of polysilicon, as opposed to the polysilicon that is used generally in many types of electronics).[60]  Consequently, Commerce relied on facts otherwise available in determining that the polysilicon market in China was distorted because information on the record indicated the GOC's significant involvement in the polysilicon industry.  To clarify, Commerce did not rely on "adverse" facts available in determining that domestic prices for solar-grade polysilicon were distorted or that the distortion affected prices paid by Chinese buyers of imported products as well as prices paid by Chinese buyers of domestically produced products.[61]  In particular, Commerce did not make a finding that the GOC failed to cooperate (the GOC claimed it did not have information specific to solar-grade polysilicon and Commerce had no reason to doubt this claim), but merely that necessary information was not on the record.  Rather, because Commerce determined that the information provided by the GOC regarding state-owned/controlled producers of polysilicon in general was not strictly relevant to the market for solar-grade polysilicon, Commerce relied on "facts otherwise available" in making the distortion determination under 19 CFR 351.511(a)(2).[62]

---

[59] *See* PDM at 15.

[60] *Id.* at 22.

[61] *Id.*

[62] In *Changzhou 3rd Review 2nd Remand Order*, the Court acknowledges that, "although it is theoretically possible that the GOC's influence over a small percentage of the general polysilicon industry results in a majority control of the production of solar-grade polysilicon, the court concludes that this possibility is too remote, without more, to serve as substantial evidence that this influence disrupts import pricing."  *See Changzhou 3rd Review 2nd Remand Order*, Slip Op. 19-137 at 20-21.

Specifically, Commerce cited the following facts in support of its conclusion that the Chinese market for solar-grade polysilicon was distorted:[63]

- A WTO Dispute Settlement Panel determination that the GOC maintains WTO-inconsistent export restraints on silicon exports and contends that these restraints operate to ensure "an abundant domestic supply of silicon in China, thus artificially depressing the domestic price of polysilicon."[64]

    The relevance of this information is that a restraint on exports of silicon (the raw material input into solar-grade polysilicon) leads to an artificial abundance of the raw material in the domestic market (due to the consequent retention of supply that would otherwise be exported), lower prices (as Chinese consumers do not have to compete with consumers worldwide) for the raw material, and thus lower prices for downstream materials, such as polysilicon.

- A 2009 *New York Times* article explaining that the GOC's State Council, or cabinet, has the ability to manage several key aspects of the solar-grade polysilicon industry, including its capacity, access to the industry, land use, and lending from state-owned commercial banks.[65]

    The relevance of this information is that it indicates the GOC subsidizes the domestic solar-grade polysilicon industry through the provision of land and financing, and that it might also have a special say in mergers and acquisitions, and barriers to new entrants. Subsidization of a product, industry concentration, and entry barriers are all factors that distort resource allocation and artificially affect supply and price. The implication of the article is that the State Council has control over aspects of the solar-grade polysilicon industry that is atypical and above the normal involvement of a government in such aspects of the economy.

---

[63] *Id.* at 23.
[64] *See* Additional Documents Memorandum at barcode 3669437-01 PDF 10 (WTO Panel Report).
[65] *See* Additional Documents Memorandum at barcode 3669437-01 PDF 14 (*New York Times* article).

- A Polysilicon Productions Data article explaining that the GOC maintains "Polysilicon Industry Access Standards," and outlining rules and restrictions to which prospective solar-grade polysilicon manufacturers in the PRC must adhere.[66]

  Again, the relevance is that the GOC takes a special interest in the solar grade polysilicon industry, creating special entrance requirements that will affect supply and price (up or down).

Commerce thus determined as "neutral" facts available that Chinese domestic prices were distorted. As indicated above, finding Chinese domestic prices are distorted means rejecting prices for imported products as well, as imported products must compete with sales from domestic sources. This is Commerce's typical practice; when we find a domestic market is distorted, we also conclude that imports into that market are distorted. Thus, when Commerce finds a domestic market distorted, it rejects all options for a "tier 1" benchmark, as enumerated in 19 CFR 351.511(a)(2)(i) ("actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions"), because all such transactions are in competition with each other for Chinese buyers in the domestic market setting. This inference is especially reasonable when imports account for less of domestic consumption than domestic production. Such is the case here. The record indicates domestic producers supply 66 percent of domestic consumption whereas imports account for the remaining 34 percent.[67]

In its comments added to the record of this remand redetermination, Canadian Solar argues that Commerce should rely on its import prices as a tier one benchmark,

---

[66] The source is mistakenly referred to as the Polysilicon Productions Data in the *Preliminary Results*. The correct source, however, is *The China Sourcing Blog*. *See* Additional Documents Memorandum at barcode 3669437 PDF 16.
[67] *See* PDM at 15*; see also* GOC's August 29, 2017 QR at 53-56.

because the information Commerce has placed on the record does not address the overall ownership of solar-grade polysilicon entities by the GOC, and thus the record does not meet the Court's substantial evidence standard.[68]  Additionally, Canadian Solar submitted information demonstrating that the domestic market was "heavily influenced by an influx of competing imports entering at lower prices" during the POR, which limited the GOC's influence in the market.[69]  Thus, according to Canadian Solar, the influx of imports would limit any possible government control of the market.  Canadian Solar also argues the evidence of distortion cited by Commerce in the *Preliminary Results* is outdated and thus irrelevant.[70]

The petitioner provided information concerning Chinese solar-grade polysilicon producer DAQO New Energy Corp., including its lengthy 20-F SEC filing, a prospectus for an American depositary share offering, and financial statements.  While the petitioner indicates the information demonstrates GOC support for the solar-grade polysilicon industry, it did not pinpoint where in the submission that conclusion can be found.

Notwithstanding Canadian Solar's arguments, Commerce continues to find that Canadian Solar's imports of polysilicon from unaffiliated suppliers cannot serve as an appropriate benchmark for polysilicon due to the GOC's involvement in the domestic industry.  The record lacks specific information on GOC ownership in the solar-grade polysilicon industry.  However, while the *Preamble* explicitly mentions government ownership in the domestic industry as a normal indicator for distortion that renders tier one benchmarks unusable, formal ownership by the government is not the only barometer

---

[68] *See* CS Polysilicon NFI at 3.
[69] *Id.* at 4.
[70] *Id.* at 10.

for distortion, as indicated by the phrase "in certain circumstances" in relevant part of the *Preamble* where the government accounts for a substantial, but not a majority, share.[71] The *Preamble* also states that the use of a tier two benchmark is permissible, "Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's *involvement* in the market."[72]  Accordingly, we have expanded our analysis to account for other factors of distortion that disrupt pricing and indicate whether the solar-grade polysilicon market is distorted by reason of the GOC's involvement.  On further review of the record, we find evidence for other *indicia* of market-distorting government involvement, as explained below.

As summarized above, record information discussed in the *Preliminary Results* shows that the GOC had border measures in place that would affect industry trade; specifically, that there was a 15 percent export duty imposed on polysilicon, which would have inhibited exports and thus presented a barrier to competition between domestic Chinese customers and world customers for polysilicon,[73] leading to an increased supply in the domestic market and downward pressure on Chinese domestic prices for all types of polysilicon, including solar-grade polysilicon.  Also as summarized above, record information discussed in the *Preliminary Results* indicates the GOC subsidizes the

---

[71] *See Countervailing Duties*, 63 FR 65348, 65377 (November 25, 1988) (*Preamble*).

[72] *Id.* (emphasis added).  Commerce has previously found a government's involvement in a market or industry to be distortive without taking government ownership into consideration.  *See, e.g., Biodiesel from Argentina: Preliminary Affirmative Countervailing Duty Determination and Preliminary Affirmative Critical Circumstances Determination, in Part*, 82 FR 40748 (August 28, 2017) and accompanying IDM at 31 (discussing the distortive effects of an export tax), *unchanged in Biodiesel from the Republic of Argentina, Final Affirmative Countervailing Duty Determination*, 82 FR 53477 (November 16, 2017) and accompanying IDM at 35; and *Biodiesel from the Republic of Indonesia:  Preliminary Affirmative Countervailing Duty Determination*, 82 FR 40746 (August 28, 2017) and accompanying PDM at 17 (discussing the distortive effects of a differential export tax (DET)), *unchanged in Biodiesel from the Republic of Indonesia:  Final Affirmative Countervailing Duty Determination*, 82 FR 53471 (November 16, 2017) and accompanying IDM at Comment 6.

[73] *See* Additional Documents Memorandum at barcode 3669437-01 PDF 10 (WTO Panel Report).

production of solar-grade polysilicon and maintains special control over the organization of the industry.[74]  Government control over industry concentration, consolidation, and new entrants distorts resource allocation and artificially affects supply and price.

Additionally, new information submitted by Canadian Solar indicates that the GOC influences domestic prices by being directly involved in reaching agreements with foreign polysilicon manufacturers to ensure a consistent supply of imported polysilicon.[75] The direct involvement of the GOC in establishing contracts with foreign manufacturers for imports of polysilicon, which generally specify agreed-upon quantities and values, evinces government intervention affecting import prices directly and further demonstrates why import prices cannot serve as reliable benchmarks.

Moreover, record information shows government industrial policies or plans in place that call for intervention in the domestic industry.  The GOC's 12th Five Year Plan for the Photovoltaic Industry identified the solar-grade polysilicon industry as a "Key Focus Area" for development and discusses several interventionist measures intended to influence the market and create favorable conditions for the domestic industry.[76] Specifically, the document states that the GOC will:  direct local governments to "resolutely curb low-level repetitive construction to avoid a mass rush into the industry, which could lead to vicious market competition,"[77] "support key polysilicon production equipment and leading enterprises,"[78] "adhere to the combination of 'led by the market and guided by the government,'"[79] and "implement differentiated policies and guide

---

[74] *Id.* at PDF 14 and 16.
[75] *See* CS Polysilicon NFI at 6 (citing a Chinese Polysilicon Market Study at 117).
[76] *See* Polysilicon NFI Memorandum at PDF 17.
[77] *Id*. at PDF 19.
[78] *Id*. at PDF 18 and 20.
[79] *Id*. at PDF 20.

industries like polysilicon to move toward the western regions."[80]  Further, the 2013

financial statement of GCL Poly, the largest Chinese manufacturer of solar-grade

polysilicon, states that, "due to close attention paid by the Chinese government,

supportive policies were launched in waves" and as a result the Chinese market

"recovered quickly in large scale."[81]

Further, record information shows significant government financial support

provided to the domestic industry, creating non-market incentives for production and

pricing, which warp the allocation of resources in the market.  As discussed above, GCL

Poly partially attributed the recovery of the Chinese polysilicon industry to "supportive

policies" implemented by the GOC and stated further that there is evidence of more

supportive policies emerging from the GOC in the future.[82]  In addition to the

aforementioned supportive policies, further measures intended to develop the domestic

polysilicon industry listed in the GOC's 12th Five Year Plan for the Solar Photovoltaic

Industry include:  providing support to major enterprises to "grow stronger so that by

2014, leading polysilicon enterprises will reach 50,000 MT per year,"[83] "develop clean,

safe, low energy consumption, high-purity, large-scale polysilicon production

technology,"[84] "support the R&D and industrialization of key production equipment used

for Polysilicon… in order to enhance product quality and PV conversion efficiency, and

to reduce energy consumption during production, strengthen the application of locally-

manufactured equipment," and focus support on energy-conservation in polysilicon

---

[80] *Id.*
[81] *Id.* at PDF 39.
[82] *Id.* at PDF 39 and 43.
[83] *Id.* at PDF 14.
[84] *Id.* at PDF 15.

production."[85]  The operation of the GOC's supportive policies can be gleaned through GCL Poly's 2013 annual report, which indicates the receipt of government grants totaling HK $222.7 million.[86]  Moreover, a stated goal of GCL Poly was to "reduce the reliance on government subsidies,"[87] exemplifying the significant role the GOC plays in the industry, as well as highlighting the solar-grade polysilicon industry's dependence on GOC support.  Finally, GCL Poly and Canadian Solar acknowledged the oversupply of solar-grade polysilicon on the market,[88] which results in downward pressure on prices.

The comprehensive development goals delineated in the GOC's own policy documents coupled with the evidence of considerable support measures extended to the domestic industry further demonstrates the GOC's significant distortive intervention in the market.  Based on the analysis set forth above, we continue to find that the record indicates significant government intervention in the polysilicon market that distorts pricing, including import prices either directly (through, for example, the GOC's import contracts) or indirectly through competition with distorted domestic production.  Accordingly, we find Canadian Solar's reported import prices unreliable as a tier one benchmark.  Therefore, for purposes of this remand redetermination, we continue to use a "tier two" benchmark to measure the benefit from this subsidy program.

6.    Xeneta Freight Data

As noted above, in the *Preliminary Results*, we relied on an average of Xeneta and Maersk data to determine ocean freight expenses.  We changed our mind for the

---

[85] *Id.* at PDF 20.
[86] *Id.* at PDF 34.
[87] *Id.* at PDF 42.
[88] *Id.* at PDF 39 and CS Polysilicon NFI at 8.

*Final Results*, after concluding that the Xeneta data did not include all applicable handling charges.[89]  The Court noted agreement among the parties that the Xeneta data may or may not include handling charges depending on which query options are selected by the user of Xeneta's website.[90]  The Court remanded the issue to Commerce to reconsider the evidence pertaining to how Canadian Solar selected the Xeneta data it submitted, noting that a comparison of Canadian Solar's data with the Xeneta data submitted by Trina indicated it included additional charges.[91]

Upon remand, Commerce agrees that the Xeneta data submitted by Canadian Solar appears to include terminal handling charges given the BPI cited by the Court on pages 8 and 9 of the Remand Order.  Therefore, for this remand redetermination, Commerce is using an average of the Maersk and Xeneta data to determine ocean freight expenses.

7.   Alleged Translation Error

In its case brief, Canadian Solar argued that electricity purchase information it had submitted to Commerce had been incorrectly translated.[92]  Essentially, the English translation Canadian Solar provided for one purchase column for two affiliates was marked as "Peak," when, according to Canadian Solar, it should have been marked as "Sharp."  The difference affects which particular benchmarks Commerce chooses to apply to the purchases listed in that column.  Canadian Solar argued the mistake was evident from a comparison of its translation of the relevant Chinese characters to the GOC's translation of the same characters in a related document.  The Court faulted

---

[89] *See* IDM at 41-42.
[90] *See* Remand Order at 7-8.
[91] *Id.* at 7-8.
[92] *See* Canadian Solar's March 5, 2018 Case Brief at 25.

Commerce for refusing to make the correction (Commerce concluded it is the responsibility of the parties themselves to submit accurate information) and remanded the issue to Commerce to reconsider.[93]  The Court indicated Commerce has a responsibility to correct errors made by the respondent when such a request is made before the final results and the error is apparent from the existing record.[94]  Upon remand, Commerce agrees that a comparison of the GOC's questionnaire response with the worksheets submitted by Canadian Solar indicates Canadian Solar mistranslated the column heading. Commerce is incorporating the correction into the revised calculations for this final remand redetermination.

**D.      Comments on Draft Remand Results**

**Issue 1:        Whether the Provision of Aluminum Extrusions for LTAR Is Specific**

*Canadian Solar Comments*

- The record for this review includes significant developments not found on the record of the remand redetermination of the third review that was recently upheld by the Court.  Commerce cannot merely rely on information from the previous review, but rather must base its determination on the current record.

- Since the third administrative, in the current fourth administrative review at issue here, the GOC provided that "{t}here are a vast number of uses for aluminum extrusions.  The industries that purchase/use aluminum extrusions are not limited, and the solar panel industry in China is not a disproportionate or predominant consumer of aluminum extrusions."[95]

---

[93] *See* Remand Order at 11.
[94] *Id.*
[95] *See* GOC August 29, 2017 QR at 86.

- Commerce wrongly concludes that it need not alter its conclusion from the third administrative review based on additional information placed on the record by Canadian Solar.

**Commerce Position:**  First of all, Commerce disagrees that the record of the underlying administrative review contains "significant developments not found on the record of the remand redetermination of the third review," as Canadian Solar insists.  Rather, as noted in the analysis section above, the GOC provided no information whatsoever in the underlying review, but simply asserted that there are a "vast number of uses for aluminum extrusions."[96]  Commerce itself added the relevant excerpts from the GOC's questionnaire response in the third review to the record of this remand redetermination. In fact, Commerce added the entire response of the GOC concerning the specificity of aluminum extrusions, including the GOC's narrative response and all exhibits.[97]

Commerce then provided parties the opportunity to provide "rebuttal information," and received such information from Canadian Solar and the petitioner.  As explained above, after reviewing the information provided by Canadian Solar, we determined that the conclusion from the third review remained unaltered:  the uses for aluminum extrusions are still primarily limited to a relatively narrow range of applications.[98]  While Canadian Solar notes in its comments that the record indicates aluminum extrusions may be used in as many as "113 industries out of 124 industries in China," that fact does not in and of itself demonstrate that end-uses of aluminum extrusions constitute something close to all manufacturing activity in China or that the

---

[96] *See* GOC August 29, 2017 QR at 86; *see also supra* n.22.
[97] *See supra* n.22.
[98] *See supra* at 11-12.

subsidy is "widely used throughout {the} economy" in the words of the Statement of Administrative Action (SAA).  As Commerce explains in the analysis section above, while usage of an input might be spread across all sectors or industries of an economy, usage would still be specific if consumption within each sector or industry is limited to narrow applications.  The Court appears to recognize this principle in upholding Commerce's finding of specificity in the third administrative review remand determination.[99]

### Issue 2:  The Proper Benchmark for Calculating the Benefit from the Provision of Aluminum Extrusions for LTAR

*Canadian Solar Comments*

- Commerce must continue to use the IHS data alone, because they are product-specific as compared to the vastly over-inclusive Comtrade data.

- Commerce's determination to exclude the Comtrade dataset from its aluminum solar frames benchmark is supported by substantial evidence and in compliance with the Remand Order.

**Commerce Position:**  For the reasons explained above in the Final Analysis, Commerce is continuing to rely solely on the IHS data for this Final Remand Redetermination.

### Issue 3:  Countervailability of Electricity for LTAR

*Canadian Solar Comments*

- The Court did not grant Commerce unlimited authority to make a new and totally different specificity determination under the statute, after nine years since the original investigation, but rather narrowly gave Commerce a second chance to

---

[99] *See Changzhou 3rd Review 2nd Remand Order*, Slip Op. 19-137 at 12.

support its earlier determination in the remand results "that the provision of electricity is specific because it is limited to certain industries."

- Commerce's remand results are not only contrary to the Court's directive, but also represent unlawful *post hoc* rationalization.[100]

- Moreover, although Commerce has a general practice of reviewing each administrative review as a standalone proceeding with its own record, Commerce's determination of program specificity within a CVD case represents an exception to this rule, because the specificity determination should be made once.[101]

- A "regionally specific subsidy program," as Commerce describes it, is not what the statute directs. The statute requires that the "subsidy {be} limited to an enterprise or industry located within a designated geographical region."[102] Commerce must name the enterprise or industry located within the designated geographical region.

- Commerce "tellingly" does not even quote section 771(5A)(D)(iv) of the Act anywhere in its draft results.

---

[100] See *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565 (Fed. Cir. 1990) (*Olympic Adhesives*) (concluding that "{a} n agency may not ... shift the grounds it relied upon for taking action. . . . The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based") (internal quotation and citation omitted); *see also Food Marketing Institute v. I.C.C.*, 587 F.2d 1285, 1290 (D.C. Cir. 1978) (*Food Marketing Institute*) ("{T}he agency's action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result. *Post hoc* rationalizations by the agency on remand are no more permissible than are such arguments when raised by appellate counsel during judicial review.").

[101] *See Magnola Metallurgy, Inc. v. United States*, 508 F.3d 1349, 1355 (Fed. Cir. 2007) (upholding Commerce's policy to "require 'new facts or evidence of changed circumstances' before it will revisit an earlier specificity determination, such as the one made in the New Shipper Review in this case. *See, e.g.*, *Pure and Alloy Magnesium from Canada: Final Results of the First (1992) Countervailing Duty Administrative Reviews*, 62 Fed. Reg. 13,857 (Mar. 24, 1997)").

[102] *See* section 771(5A)(D)(iv) of the Act.

- Moreover, the record shows that there is no geographic region receiving electricity for LTAR.  The electricity schedules for every province on the record demonstrate that there is no single lowest subsidized region or province.

- While Commerce may find that the price schedules illustrate provincial price variation, they do not illustrate, even under AFA, that any "designated geographic region" is subsidized as is required by statute.

- Commerce must examine the actual "use" of a subsidy and the "amount" of the subsidy that various industries received.

- A review of the price schedules demonstrates that there is no single province or geographic region that Commerce can infer is receiving subsidized electricity rates.

- Commerce must limit its AFA finding to the regions with the lowest rates for each usage category (*i.e.*, normal, sharp, peak, etc.) for "large industrial" and "commerce/general" users.  The record does not support any adverse inference with regard to other provinces.

- Commerce has illogically determined that, in effect, all areas in China are receiving subsidized electricity rates, which is the antithesis of specificity.  Under Commerce's approach, no user escapes the subsidy.

- The statute says plainly that a subsidy is specific if it "is limited to *an enterprise or industry* located within a designated geographical region within the jurisdiction."  Commerce reads "an enterprise or industry" out of the statute and appears to take the position that a subsidy can be countervailable under this section even if the program benefits all users in a region, which is

impermissible.[103]  Commerce's failure to make a finding consistent with the plain

language of the Act is also inconsistent with its past practice.[104]

- There can be no claim that the solar cells industry is specifically subsidized,

  because the record demonstrates that both mandatory respondents paid the

  published electricity rates and all electricity schedules on the record show that the

  prices are categorized by logical user categories with no evidence of industry

  preference, such as commercial use, residential use, large industry use, and

  various time of use categories.  In other words, where all industries within a

  province pay the same electricity rates according to the rate schedule, then there is

  no evidence supporting a conclusion that a regional subsidy benefits any specific

  industry according to the statutory requirement.

- The record shows that the NDRC simply does not possess the authority to direct

  price changes.

- Commerce's analysis wrongly focuses on Notice 2909.  The evidence indicates

  the more specific provisions of Notice 748 control over the broader authority

  under Notice 2909.  Notice 748 dictates that "the provinces (autonomous regions

  and municipalities) price departments develop and issue specific adjustment

---

[103] *See Samsung Electronics. Co. v. United States*, 973 F. Supp. 2d 1321, 1329 (CIT 2014) (*Samsung*) (referencing and interpreting Commerce's determination in Live Cattle from Canada not to investigate the British Columbia Farm Product Industry Act and finding that the program was not regionally specific, in part because "Commerce found that {the} subsidy {was} available throughout British Columbia.").

[104] *See Pre-Stressed Concrete Steel Wire Strand from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 75 FR 28557 (May 21, 2010) and accompanying IDM (*Pre-Stressed Concrete Steel Wire Strand* IDM) at the "Provision of Land Use Rights for LTAR to FIES n Jiangxi and the City of Xinyu" section; and *Laminated Woven Sacks from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 FR 35639 (June 24, 2008) and IDM (*LWS* IDM) at Comment 8.

plan{s}" that only need be "in accordance with" the general standards set forth by the NDRC.

- Commerce in no way addresses the GOC's assertion that "{t}he price adjustment values contained in Notice 748 must be taken into account by each province," but they are "not strictly mandatory."

**Commerce Position:**  As an initial matter, Commerce disagrees with Canadian Solar that it exceeded the scope of the *Remand Order*.  In its second remand of the third review, the Court instructed Commerce to "set forth its reasoning under the statutory steps for drawing adverse inferences to fill record gaps."[105]  In the analysis above, Commerce has complied with the Court's order to clarify its reasoning for making a specificity determination on the basis of AFA.  As stated above, Commerce has reconsidered its original decision regarding its *de facto* specificity determination; however, we continue to find that AFA is warranted due to the GOC's failure to provide Commerce with complete information regarding how electricity prices are set and why they vary on a provincial basis.

Moreover, the precedent cited by Canadian Solar is not applicable.  In *Olympic Adhesives*, the Federal Circuit was stating the rule that arguments made by the U.S. Government (USG) in front of the Court cannot depart from the arguments and factual record developed before Commerce in an administrative proceeding.[106]  That is not the case here.  Commerce's determination regarding regional specificity was developed in the context of an administrative proceeding (*i.e.*, the current remand redetermination) and

---

[105] *See Changzhou 3rd Review 2nd Remand Order* at 24.
[106] *See Olympic Adhesives*, 899 F.2d at 1572.

thus does not constitute a *post hoc* rationalization offered by the USG on behalf of Commerce outside the confines of an administrative proceeding.  Likewise, in *Food Marketing Institute*, the Court of Appeals for the D.C. Circuit did not establish a rule that an agency cannot change its reasoning for arriving at a particular conclusion upon remand.  Rather, the Court recognized "the danger that an agency, having reached a particular result, may become so committed to that result as to resist engaging in any reconsideration of the issues," and, thus, noted that a remand redetermination "must be more than a barren exercise of supplying reasons to support a pre-ordained result."[107] Contrary to being a "barren" exercise, Commerce's analysis above offers a fulsome description of the GOC's failure to explain how it sets electricity prices across provinces and how that failure leads to the conclusion that the provision of electricity at LTAR is, thus, regionally specific, pursuant to section 771(5A)(D)(iv) of the Act.

Sections 776(a)(1) and (2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" in reaching the applicable determination if necessary information is not on the record, or if an interested party: withholds information requested by Commerce; fails to provide such information by the established deadlines, or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782 of the Act; significantly impedes a proceeding; or provides such information but the information cannot be verified as provided by section 782(i) of the Act.

Section 776(b) of the Act further provides that Commerce may use an adverse inference in selecting from among the facts otherwise available when a party fails to

---

[107] *See Food Marketing Institute*, 587 F.2d. at 1290.

cooperate by not acting to the best of its ability to comply with a request for information.

Furthermore, section 776(b)(2) of the Act states that an adverse inference may include

reliance on information derived from the petition, the final determination from the

investigation, a previous administrative review, or other information placed on the record.

When selecting an AFA rate from among the possible sources of information,

Commerce's practice is to ensure that the rate is sufficiently adverse "as to effectuate the

statutory purposes of the adverse facts available rule to induce respondents to provide

Commerce with complete and accurate information in a timely manner."[108]  In so doing,

Commerce is not required to determine, or make any adjustments to, a countervailable

subsidy rate based on any assumptions about the information an interested party would

have provided if the interested party had complied with the request for information.[109]

There is insufficient information on the record as a result of the GOC's refusal to

cooperate with Commerce's requests for information regarding the program.

Accordingly, Commerce must rely on facts otherwise available to fill the gap in the

record created by the GOC's noncooperation.  For the reasons stated above, Commerce

finds that the program is regionally specific because the record indicates that the GOC at

the national level (*i.e.*, the NDRC) has arbitrarily set varying prices across provinces.

Canadian Solar asserts that Commerce must identify which specific region is being

subsidized.  Canadian Solar also argues that under Commerce's AFA construct, all

provinces would be considered subsidized, thus undercutting our regional specificity

---

[108] *See*, *e.g. Drill Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 76 FR 1971 (January 11, 2011) (*Drill Pipe from China Final*); *see also Notice of Final Determination of Sales at Less Than Fair Value:  Static Random Access Memory Semiconductors from Taiwan*, 63FR 8909, 8932 (February 23, 1998).
[109] *See* sections 776(c) and 776(d)(3) of the Act.

finding. Simply put, the record indicates that prices vary on a provincial basis and that the GOC is somehow involved in setting electricity prices; however, the GOC refused to provide Commerce with the complete details of its involvement. As a result, Commerce draws the adverse inference that prices in the province or provinces in which the respondents are located are preferential; *i.e.*, they are not the result of cost differences or other market influences, but rather the result of a GOC policy to incentivize economic activity in particular regions. Canadian Solar misinterprets Commerce's reasoning and insists that Commerce has a statutory obligation to identify the region being subsidized; however, requiring Commerce to identify which provinces might actually be benefitting from such a GOC policy would be unreasonable – given the GOC's failure to provide relevant information – and would go beyond the requirements of applying AFA. As noted above, Commerce cannot identify which provinces are being subsidized by the GOC, due to its failure to provide Commerce with the requested information.

In this regard, it is critical to understand that Commerce is not finding that "low" electricity prices are, in and of themselves, a subsidy. Rather, there is a subsidy to the extent that electricity prices are below prices that would be set in accordance with typical commercial and market considerations. Thus, Canadian Solar's suggestion that Commerce limit the AFA finding to the regions that have the lowest prices is not reasonable. It could be that there are actual commercial or market considerations (*e.g.*, demand, supply, cost, *etc.*) that explain the low prices in such regions, and it could be that the provinces paying the high prices would be paying even higher prices if the prices were set in accordance with market factors. Commerce cannot tell simply by looking at a list of prices by region which prices are market driven and which are subsidized. There is

no reason to assume that the low prices must be the subsidized prices.  The burden that

Canadian Solar argues Commerce must adhere to by divining which province or

provinces are receiving the beneficial rates is unreasonable, given the GOC's lack of

cooperation.  The Court should not create a standard that prohibits Commerce from

applying AFA without a detailed factual predicate for all aspects of the subsidy finding

when such an analysis has become impossible precisely because of the GOC's failure to

cooperate.

In applying AFA, Commerce is not required to determine the exact and actual

information that would have been disclosed if the GOC had cooperated.[110]  Rather in the

absence of cooperation, Commerce must draw an inference, that while adverse, can

reasonably be connected to information on the record.[111]  In this case, Commerce has

concluded that the record indicates one or more provinces may be benefitting from

preferential electricity rates, including the provinces in which the respondents are located.

Canadian Solar also takes issue with Commerce's reading of section

771(5A)(D)(iv) of the Act, which provides that a subsidy is specific where "limited to an

enterprise or industry located within a designated geographical region within the

jurisdiction of the authority providing the subsidy."  Canadian Solar focuses on the

language "limited to an enterprise or industry," and concludes this means Commerce

must identify an enterprise or industry (or group thereof) within the region that is targeted

by the subsidizing authority or that is exclusively located within the region.  This

interpretation is incorrect; it directly contradicts the SAA, would render section

771(5A(D)(iv) superfluous, and has no basis in any Commerce or Court precedent.  First,

---

[110] *See* section 776(b)(1)(B) of the Act.
[111] *See* sections 776(c) and 776(d)(3) of the Act.

the SAA states, "subsidies granted by a state or province that are not limited to a specific enterprise, industry or group thereof within the state or province are not considered specific, and, therefore, are not countervailable.  However, subsidies provided by a central government to particular regions (including a province or a state) are specific *regardless of the degree of availability or use within the region*."[112]  Moreover, if Canadian Solar's interpretation were correct, there would be no need for section 771(5A)(D)(iv) of the Act, because, being limited to an enterprise or industry (or group of enterprises or industries), the subsidy would already be considered specific under either section 771(5A)(D)(i) or section 771(5A)(D)(iii)(I) of the Act.

The precedents cited by Canadian Solar are not on point.  *Samsung* simply stands for the proposition that a regionally specific subsidy cannot be generally available throughout the jurisdiction of the subsidizing authority.  That is, the subsidy has to be limited to a geographic "subset" within the authority's jurisdiction.  Moreover, in *Samsung*, the Court sustained Commerce's regional specificity determination for a program limited to companies making investments in the area outside the Seoul Metropolitan area.[113]  Therefore, *Samsung* actually supports the conclusion that a subsidy need not be limited to a single region to be considered regionally specific, as long as the subsidy is limited to a subset within the authority's jurisdiction.  Referring to the investigation of live cattle from Canada, the Court found:  "It is consistent with both the Act and the instant case that Commerce found that a subsidy available throughout British Columbia and administered by the province itself was not regionally specific."[114]  Thus,

---

[112] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol 1 (1994) (SAA) at 932 ("Regional Specificity") (emphasis added).
[113] *See Samsung*, 973 F. Supp. 2d at 1328-29.
[114] *See Samsung*, 973 F. Supp. 2d at 1329.

this is why it was necessary for Commerce to explain to the Court in the analysis above the conclusion that the subsidizing authority in the provision of electricity is the NDRC of the central GOC.

In pre-stressed concrete steel wire strand, as Canadian Solar notes, Commerce countervailed land provided to foreign invested enterprises (FIEs) within an industrial park. However, the specificity determination in no way hinged on the fact that (apparently) only FIEs were eligible for the subsidized land. Commerce stated simply: "In the instant investigation we find that the Xinyu Hi-Tech Economic Development Zone is a designated area that is under the jurisdiction of the City of Xinyu. Therefore, consistent with LWS from the PRC, we determine that Xinyu's purchase of granted land-use rights located within the Xinyu Hi-Tech Economic Development Zone in 2004 gives rise to countervailable subsidies to the extent that the purchases conferred a benefit."[115]

Canadian Solar next cites the investigation of laminated woven sacks from China to support its reading of section 771(5A)(D)(iv) of the Act, but this case appears to explicitly *reject* Canadian Solar's interpretation. Far from concluding that the subsidy must be limited to an enterprise or industry in the designated region (the New Century Industrial Park of Huantai County), Commerce concluded: "Because the provision of land-use rights is regionally specific under section 771(5A)(D)(iv) of the Act, there is no requirement in our law for evaluating specificity on a *de facto* basis, *i.e.*, pursuant to the criteria set forth under section 771(5A)(D)(iii). As such, the GOC's arguments about the number of users and the types of industries in the industrial park are not relevant to our specificity analysis."[116] Accordingly, Commerce considers the information and

---

[115] *See Pre-Stressed Concrete Steel Wire Strand* IDM at 24-25.
[116] *See LWS* IDM at 55.

arguments provided by Canadian Solar concerning the locations of solar cell producers throughout China to be irrelevant to the determination of whether the provision of electricity is regionally specific.

Finally, Canadian Solar takes issue with Commerce's conclusion that electricity prices are set centrally by the GOC's NDRC.  Commerce continues to find the conclusion is supported, given that the documents referenced (Notice 2909 and Notice 748) clearly indicate that the NDRC is still the ultimate price setting authority and that any role played by the provinces is done in accordance with the NDRC's instructions, as explained in detail in the analysis section above.  Canadian Solar unconvincingly attempts to dismiss Notice 2909.  There is nothing on the record, however, indicating that Notice 2909 has been repealed or that it has somehow otherwise been rendered obsolete or ineffectual.  In fact, as noted above, Commerce specifically offered parties the opportunity to demonstrate otherwise, and no party attempted to do so.[117]  Regardless, even if Canadian Solar's interpretation is correct, and Notice 2909 has been in essence supplanted by Notice 748, Commerce has explained how that document also retains price setting authority within the NDRC.

Accordingly, pursuant to sections 776(b) and 771(5A)(D)(iv) of the Act, Commerce continues to find the program regionally specific, on the basis of AFA.

**Issue 4:  Correction of Canadian Solar's Translation Error**

*Canadian Solar Comments*

- Commerce rightly found in its draft remand results that "a comparison of the GOC's questionnaire response with the worksheets submitted by Canadian Solar

---

[117] *See supra* n.47.

indicates Canadian Solar mistranslated" certain column headings.  Given that the translation error is obvious once compared to the GOC's response, Commerce must continue to make this correction in its final remand redetermination.

**Commerce Position:**  Commerce continues to rely on the corrected column headings for this final remand redetermination.

### Issue 5:  Distortion of the Polysilicon Market

*Canadian Solar Comments*

- The additional evidence placed on the record by Commerce does not reasonably support Commerce's finding that government intervention significantly distorted prices such that it could not rely on a tier-one benchmark.

- The GOC provided data related to the overall polysilicon market, establishing that the total output of polysilicon by companies in which the GOC maintains an ownership interest is a small percentage of overall Chinese output.  Commerce does not dispute this fact but instead argues that it is not indicative of ownership because the information is not specific to solar-grade polysilicon.

- Commerce fails to support its assertion that the solar-grade polysilicon market differs significantly from the general polysilicon market.  Commerce, therefore, violates the Court's order by not providing sufficient evidence to show that the GOC's slight participation in the general polysilicon market led to distorted import prices of solar-grade polysilicon.

- The GOC may be engaging in activities that could distort domestic polysilicon prices, but the actual impact will be minimal unless the GOC constitutes a significant share of the market.

- Commerce references *Biodiesel from Argentina* in support of its conclusion that government ownership in a market is not necessary for finding a market distorted. *Biodiesel from Argentina*, however, does not even reference government ownership.  Moreover, import prices in the biodiesel investigation were higher than domestic prices; whereas in this case import prices are generally lower than domestically produced solar-grade polysilicon.

- Likewise, Commerce's reference to supercalendered paper from Canada is irrelevant, because the government owned a significant share of the market in that case, unlike in the current case.

- Commerce cannot ignore record evidence establishing limited ownership of the market by the GOC in favor of analyzing other factors of distortion.

- Deviation from the normal practice of assessing government ownership suggests application of a negative inference which is precisely what Commerce has done under the pretense of using a neutral gap-filling methodology.

- Using neutral facts available, Commerce relies on outdated and nebulous information in the face of other substantial record evidence demonstrating the important role that imports play in domestic market price-setting.

- Much of the information Commerce references in its distortion analysis is outdated.  Outdated information outside of the POR on its face cannot represent "accurate" data as market situations frequently change as evidenced by Commerce's preference for contemporaneous data when constructing a benchmark.

- There is no gap in the record because the information that Commerce requested from the GOC does not exist.

**Commerce Position:**  While the *Preamble* explicitly mentions substantial government ownership in the domestic industry as the normal indicator of distortion that renders tier-one benchmarks (including imports) unusable,[118] factors other than, or in addition to, substantial government ownership can also support a distortion finding.[119]  Commerce's regulations nowhere state that a determination of distortion must be limited to situations in which there is majority government ownership of a specific industry.  Such a practice would be unreasonable when the objective of our analysis under 19 CFR 351.511(a)(2) is to find an accurate measure of remuneration (accurate in the sense of market-determined) in order to determine the extent of the subsidy benefit.[120]  If Commerce only moved beyond "internal" pricing as a measure of remuneration when the foreign government under examination owned a majority of the industry in question, we might frequently end up relying on distorted prices that do not accurately represent the market-determined value of the good at issue.  Recent examples include the investigations of biodiesel from Argentina and Indonesia in which government ownership and control over the producers of the inputs at issue (soybeans and palm oil, respectively) was not taken into consideration.  Nevertheless, because the governments of the two countries had, through

---

[118] *See* 19 CFR 351.511(a)(2) (noting that "actual transactions" comprising a tier one benchmark include prices stemming from private parties, actual imports, or in certain circumstances, sales from competitively run government auctions).

[119] *See Preamble*, 63 FR at 65377 (explaining that government induced distortion will "normally" be minimal absent majority or substantial government control over the industry in question).

[120] In this regard, 19 CFR 351.511(a)(2)(i) refers to the use of a "market-determined price" as the measure of adequate remuneration and 19 CFR 351.511(a)(2)(ii) calls for relying on a tier two benchmark (*i.e.*, no more import prices or other internal prices) when "actual market-determined prices" are unavailable in the country under examination.

other means (export taxes), distorted internal prices for soybeans and palm oil,

Commerce measured remuneration through external, tier two prices.[121]  Canadian Solar

takes issue with our reference to biodiesel because "{t}here is no indication in the pages

referenced by Commerce that it even considered the level of government ownership in its

analysis in this investigation."[122]  That is precisely the point.  Commerce did not consider

government ownership in concluding the prices of soybeans and palm oil were distorted

because the export taxes alone were solid examples of government induced distortion.[123]

As explained at length in the analysis section above, the GOC could not provide

its ownership share of the solar-grade polysilicon industry, and, thus, Commerce does not

know what percentage of the solar-grade polysilicon market is owned by the GOC.  By

Canadian Solar's reasoning, Commerce should assume the GOC's ownership or

involvement in the solar-grade polysilicon industry is insignificant, given the ownership

information for the overall polysilicon market; however, drawing such a conclusion does

not logically follow.  Ownership information for the polysilicon industry does not

substitute for ownership information for the solar-grade polysilicon industry.  Notably,

the record does not contain any information indicating that the level of government

ownership for the solar-grade polysilicon industry is at a level similar to the polysilicon

---

[121] *See Biodiesel from Argentina:  Preliminary Affirmative Countervailing Duty Determination and Preliminary Affirmative Critical Circumstances Determination, in Part*, 82 FR 40748 (August 28, 2017), and accompanying PDM at 31, unchanged at the final determination; *see also Biodiesel from the Republic of Indonesia:  Preliminary Affirmative Countervailing Duty Determination*, 82 FR 40746 (August 28, 2017), and accompanying PDM at 17, unchanged at the final determination.
[122] *See* Canadian Solar Comments at 30.
[123] Commerce concedes that its reference to the biodiesel investigations was poorly worded in the draft analysis.  We should have stated that government ownership was not taken into consideration in either biodiesel investigation, not that "the government had little or no ownership of production."  While true, that claim is not established in the pages cited by Commerce and is also beside the point.  The important fact is that government ownership was not considered in either case.  Commerce has, thus, revised the relevant language in the final analysis section above.  Commerce has also deleted the reference to the supercalendered paper investigation included in the draft analysis.

industry.  Moreover, because there is no information on the record detailing what proportion of the polysilicon industry is comprised of solar-grade polysilicon production, it could be that, for example, despite low government ownership of the polysilicon industry, government ownership is disproportionately concentrated in solar-grade polysilicon such that it would support a distortion finding.  In light of these considerations, using the ownership information for polysilicon in general as a proxy for ownership information for solar-grade polysilicon in particular would not provide a reliable basis for assessing the relative significance of government ownership.  Thus, we are not drawing conclusions or adverse inferences regarding government ownership of the solar-grade polysilicon industry.  Instead, we continue to find it necessary to rely on other factors in analyzing whether the solar-grade polysilicon market in China was distorted.  For this reason, we re-opened the record and solicited additional information from interested parties regarding the solar-grade polysilicon industry in China.

Insofar as Canadian Solar is now, at this late stage, disputing that there is a significant distinction between solar-grade polysilicon and general polysilicon or between the industries that produce the two products,[124] the record does, in fact, establish such a distinction.  For example, the GOC refers to "support {for} solar-level polysilicon production technology," which it distinguishes from "electronic-grade polysilicon."[125]  In Canadian Solar's submission of benchmark information, it included prices "specific to

---

[124] Canadian Solar states that such a distinction is "unsubstantiated" and that Commerce has failed "to support its assertion that the solar-grade polysilicon {industry} differs from the significantly from {sic} the general polysilicon market" and that Commerce thus "continues to violate the Court's remand order by not providing sufficient evidence to show how 'the GOC's {small ownership} of the general polysilicon market led to distorted prices of solar grade polysilicon.'"  *See* Canadian Solar Comments at 29.

[125] *See* Polysilicon NFI Memorandum at PDF 17 (the GOC's five-year plan for the solar industry).

solar grade polysilicon" from EnergyTrend, Greentech Media, and Bloomberg New Energy Finance.[126]

The financial statements of GCL-Poly Energy Holdings Ltd. refer to Chinese tariffs on imports of "solar grade polysilicon" from the United States and Korea,[127] and Canadian Solar itself earlier accused Commerce of having a "false understanding of the Chinese *solar-grade polysilicon market*,"[128] thus acknowledging that there is such a distinct market, and also referred to "solar-grade polysilicon producers in the United States, such as REC Silicon" in the same submission.[129]  In fact, Canadian Solar's submission of polysilicon NFI is replete with references to "solar-grade polysilicon."  As another example, a research report provided by Canadian Solar states that "*solar grade polysilicon is the major raw material of crystal silicon photovoltaic battery pieces and the fundamental link with the highest technical barrier and the most intensive investment in the whole photovoltaic industry chain.*"[130]  In response to Commerce's request for information concerning "solar-grade polysilicon," the GOC stated that it "does not collect data that is specific solar grade polysilicon.  Instead, the {State Statistical Bureau} collects data for polysilicon, of all grades,"[131] implying an acknowledgement that there is a distinct market for solar-grade polysilicon.

The examination of other factors that indicate distortion is not a "pivot," as Canadian Solar claims.  In the initial questionnaire issued to the GOC concerning the program at issue, Commerce asked for several types of information indicative of a

---

[126] *See* Canadian Solar's November 1, 2017 Benchmark Submission at 2.
[127] *See* Polysilicon NFI Memorandum at PDF 39; *see also* CS Polysilicon NFI at PDF 48 and 50 (press releases concerning China's final determinations on "solar grade" polysilicon).
[128] *See* CS Polysilicon NFI at 4 (emphasis added).
[129] *Id.* at 5.
[130] *Id.* at PDF 44 (emphasis added).
[131] *See* GOC August 29, 2017 QR at 34.

distorted market besides ownership information.  The questions concerning "other factors" are part of the "boilerplate" initial questionnaire issued in all CVD proceedings, not just in proceedings involving solar cells or solar products.  For example, Commerce asked about export taxes, pricing regulation, and industry associations that might lead to distorted prices for solar-grade polysilicon.[132]  Moreover, as explained above, in the preliminary and final results of review, Commerce relied on information on the record of the review indicating market-distortive government involvement other than government ownership or (corporate) control of producers.  In the Draft Remand Results, Commerce simply expanded upon the earlier examination of other information to include additional government-related factors that might lead to a distorted market.  This analysis complies with the Court's directive to "provide sufficient evidence supporting Commerce's contention that the GOC's participation in the solar-grade polysilicon industry renders {Canadian Solar's import} data unreliable."[133]

After consideration of all the new information on the record, including information submitted by Canadian Solar, Commerce determined that the solar-grade polysilicon industry in China was distorted by reason of the GOC's involvement in the market.  In its comments, Canadian Solar asserts that Commerce's finding of distortion is tantamount to "an unlawful application of AFA."  We disagree.  Commerce's finding was based on a thorough analysis of the facts available on the record, without adverse inferences, as discussed above at length, including information placed on the record by

---

[132] *See* GOC August 29, 2017 QR at 56-57.
[133] *See Changzhou 3rd Review 2nd Remand Order* at 21.

Canadian Solar, some of which further supports a finding of distortion.[134]  Commerce did

not limit itself to drawing an inference from only a particular subset of facts adverse to

the GOC's or the respondents' interests.  Just because the outcome of Commerce's

finding may be contrary to Canadian Solar's interests does not mean that it relies on

adverse inferences.[135]  The relevant facts are that:  (1) the GOC could not provide

information concerning its ownership in the solar-grade polysilicon industry, thus,

creating a gap of information on the record; and (2) the record amply demonstrates that

the GOC is significantly involved in the solar-grade polysilicon industry in a manner that

leads to distorted, non-market prices in the internal Chinese market, including import

purchases made by Chinese consumers of materials originating outside China.

Canadian Solar then asserts that the information relied upon for our analysis is

outdated because not all the information is contemporaneous with the POR.  However, no

information on the record indicates that the conditions in 2015 (*i.e.*, the POR) have

changed significantly, if at all, from the conditions referenced in 2009 (*i.e.*, the date of the

oldest documents on the record).

Canadian Solar also argues that the fact that imports of solar-grade polysilicon

account for nearly 33 percent of domestic consumption mitigates any distortive effects

---

[134] *See* CS Polysilicon NFI at 6-7.  As discussed in the analysis section above, Canadian Solar submitted information acknowledging an oversupply of solar-grade polysilicon in China, which results in downward pressure on prices. Further, as discussed in detail in the analysis section and below, Canadian Solar also claims that imports of solar-grade polysilicon are being dumped in China and depress domestic prices as a result.

[135] Commerce notes that it is far from clear that selecting an external, type two benchmark is – at least in general – an "adverse" finding.  While 19 CFR 351.511 establishes a preference for using internal prices, there is no reason to assume that external prices will – as a rule – lead to the determination of higher subsidy rates for respondents.  The decision to select external prices as a benchmark is not punitive, but rather the result of the conclusion that in particular circumstances external prices provide a better measure of market-based values than internal prices. Sometimes distortion might lead to lower internal prices and sometimes it might lead to higher internal prices. Nowhere in Commerce's practice does it take into consideration a comparison of internal prices with external prices to determine whether the distortion leans in one direction or the other.  The question simply is whether the internal prices can be trusted, not whether they are higher or lower than external prices.

from the GOC's involvement in the market.[136]  However, as highlighted above, information submitted by Canadian Solar demonstrates that the GOC is directly involved in securing contracts with foreign manufacturers to ensure a steady supply of imported, solar-grade polysilicon.[137]  This fact evinces the GOC's significant interference in the solar-grade polysilicon market and underscores precisely why import prices cannot serve as reliable benchmarks, as they are influenced by the GOC.  Accordingly, we have considered all relevant information on the record in determining whether the net effect is a distorted internal market, rendering all internal purchases, whether of imported or domestically produced material, unreliable indicators of value.

We also find Canadian Solar's argument that imports drive domestic prices lower unconvincing because there is no information on the record indicating that import prices drive down domestic prices rather than the inverse (*i.e.*, that domestic prices drive down imported prices).  In fact, for the reasons discussed already, the GOC's significant involvement in the solar-grade polysilicon market suggests that import prices are indeed depressed as a result of government involvement and distorted domestic prices.  Canadian Solar was provided an opportunity to support its claims with evidence, but its only argument hinges on the GOC's imposition of antidumping duties on imports of solar-grade polysilicon from the U.S., the European Union, and Korea.  Moreover, in citing the GOC's import trade remedies, Canadian Solar again undermines its own argument.  If Canadian Solar believes that antidumping duties are evidence of distorted import prices, then it follows that import prices would be unreliable for this reason as well.  It is inconsistent for Canadian Solar to present the imposition of antidumping

---

[136] *See* GOC August 29, 2017 QR at 54-55.
[137] *See* CS Polysilicon NFI at 6 (citing a Chinese Polysilicon Market Study).

duties against the U.S., the European Union, and Korea as evidence of distorted import prices, while also maintaining that import prices represent a reliable benchmark.

Thus, Commerce's finding of distortion in the solar-grade polysilicon market is based on the reasonable conclusion, from a full examination of the facts on the record, that the GOC is significantly involved in the solar-grade polysilicon market, such that all internal, tier one prices, including purchases from domestic sources as well as imports, do not provide market-determined measures of adequate remuneration.

**Issue 6:  Clerical Error in the Use of Xeneta Freight Data**

*Canadian Solar Comments*

- In the underlying review, and again in the Draft Remand Results, Commerce inadvertently applied the incorrect benchmarks to certain purchases of solar glass by members of the group of Canadian Solar cross-owned affiliates.

*Trina Solar Comments*

- Commerce correctly changed its mind to conclude that the Xeneta data does include all applicable terminal handling charges.

**Commerce Position:**  Commerce agrees that the incorrect benchmark was applied to certain purchases of solar glass by members of the group of Canadian Solar cross-owned affiliates.  Specifically, in the underlying review, Commerce determined specific benchmarks for each member of the group by incorporating company-specific inland freight data reported by Canadian Solar for the various affiliates.  In determining the benefits under this program, in certain instances, Commerce applied the rate determined for one affiliate to purchases of another affiliate.  Commerce has corrected this ministerial error for this final remand redetermination.

**Issue 7:  Removal of AFA Rate for the Export Buyer's Credit Program**

*Canadian Solar Comments*

- Commerce must continue to remove any benefit assigned to Canadian Solar under the EBCP in its final remand redetermination.

*Trina Solar Comments*

- Commerce's reasoning that it could not accurately verify respondents' certifications that they did not use the EBCP without information regarding the operation concerning the EBCP's operation is unsupported by substantial evidence.

- Commerce "fails to explain why . . . {it} could not accurately and meaningfully verify respondents' non-use by cross-referencing the importer's and exporter's records to ensure that any funds appeared to originate from the Ex-Im Bank, even if the funds may have flowed through an intermediary bank at some point."

- Commerce "fails to explain how the 2013 interim regulations . . . have any impact on the Department's ability to verify Trina's non-usage where there is no evidence on the record that {Trina's U.S. affiliate} had any borrowing during the POR and where the Department never requested any information" concerning such borrowings.

- If Trina's U.S. affiliate (Trina Solar (U.S.), Inc., or TUS) had no loans during the POR, it logically follows that it could not have benefitted from the EBCP, as the record demonstrates only imports outside of China are eligible for the credits.

*Petitioner Comments*

- Throughout the underlying review, the GOC refused to provide sufficient information regarding the EBCP; specifically, the GOC failed to provide necessary information relating to the 2013 revisions of the program and critical information regarding the use of third-party banks in distributing funds for the program.

- The GOC's omissions and provision of outdated information made it impossible for Commerce to effectively verify respondents' reporting regarding this program, including customer certifications, due to a lack of understanding of how the program operates.

- Commerce's ability to verify whether a program was used is necessarily dependent on the agency's understanding of how, exactly, that subsidy program operates and the manner in which it could be used to benefit foreign producers. Without such an understanding, Commerce cannot meaningfully ascertain non-use and, therefore, its determination of non-use in these draft remand results is inappropriate.

- Commerce's position in the Draft Remand Results, required by the Court's ruling in the appeal of the third CVD review and the subsequent remand in this appeal, provides no incentive for the GOC to cooperate, meaning that Commerce will never be able to obtain the necessary information on this subsidy program from the GOC.

**Commerce Position:**  Despite agreeing with Commerce's determination to find the EBCP non-used by the respondents, in its comments, Trina poses a hypothetical situation

involving its U.S. affiliate, TUS, in which "*if* TUS—the only entity to which Trina sold during the POR that was potentially eligible to borrow from the EBCP—had no loans during the POR, the Department could be assured Trina did not use or benefit from the EBCP without differentiating ordinary commercial loans from EBCP-supported loans."[138]  Trina then attempts to fault Commerce for failing to consider the potential impact this scenario could have on its ability to verify the EBCP.  In its comments, Trina states, "the Department's analysis does not explain why it could not conduct a verification likely to yield accurate and meaningful results if it reopened the record to solicit information from TUS in order to determine whether it had any borrowing during the POR and solicit any relevant information that could prove helpful in verifying the source of any potential borrowing by TUS."[139]  However, despite posing this hypothetical scenario, Trina Solar has never attempted to provide information demonstrating that its U.S. affiliate had no loans during the POR.  Moreover, as discussed in Changzhou 3rd Review 1st Remand Redetermination, Trina's Form 20-F,[140] which represents the consolidated activity of Trina Solar (*i.e.*, the activity of Trina and its subsidiaries), indicates $2 billion in U.S. sales during the POR and $800 million in current borrowings.[141]  As TUS is the sole sales arm of Trina in the United States, it is responsible for a significant portion of Trina's POR sales.  Commerce cites the information concerning Trina's sales and borrowings as a means of estimating the lending likely received by TUS.  In its comments, Trina cites no other information on the record that would give a more precise estimate of the debt belonging to TUS specifically;

---

[138] *See* Trina Draft Remand Comments at 7 (emphasis added).
[139] *Id.*
[140] Trina submitted this form to the U.S. Securities and Exchange Commission.
[141] *See* Changzhou 3rd Review 1st Remand Redetermination at 21 and 52.

it simply states that Commerce has no direct evidence of this figure.  Thus, this information represents the best information on the record indicating the extent of TUS' operations and the volume of loans Commerce would have to contend with if it attempted verification of the EBCP.

Nevertheless, because we have found, consistent with the Court's opinions in the third review litigation, that the respondents did not use the EBCP, speculative analysis of Trina's hypothetical scenario has no bearing on this proceeding.  Furthermore, finding the program "non-used" complies with the Court's instruction to avoid adversely impacting a cooperative party.  Thus, Trina's argument is moot.

We agree with the petitioner that the GOC failed to provide necessary information that would allow Commerce to conduct a thorough, meaningful, and accurate verification of the EBCP; however, given the inability to verify, continuing to assign an AFA rate to the respondents for their presumed benefit and use of the EBCP in this proceeding would not comply with the Court's *Order*.  Accordingly, we continue to find the EBCP "non-used" by the respondents.

**E.       Final Results of Redetermination**

Pursuant to the Court's granting of our requests for voluntary remand, we have found the EBCP not used (per the Court's third review rulings), revised our analysis of aluminum consumption in China, recalculated the benefits under the same program using solely the IHS data as a benchmark, and revised our specificity analysis for the provision of electricity.  Pursuant to the Court's instructions, we have also reevaluated the market for solar-grade polysilicon in China and provided additional analysis maintaining our conclusion that an external benchmark for solar-grade polysilicon is necessary.  Finally,

also pursuant to the Court's instructions, we have reevaluated the evidence concerning

the Xeneta data and terminal handling charges, and determined to use that data in the

revised calculations, and we have revised the electricity calculations for Canadian Solar

pursuant to our examination of its translation error.  If these remand results are affirmed

by the Court, we intend to issue amended final results providing the updated subsidy rates

below (**in bold**).

| Company Name | Program | *Final Results* | Draft Results Pursuant to Redetermination |
|---|---|---|---|
| Trina | Solar Grade Polysilicon for LTAR | 0.26% | **0.25%** |
| | Aluminum Extrusions for LTAR | 0.46% | **0.01%** |
| | Solar Glass for LTAR | 2.26% | **1.99%** |
| | EBCP | 5.46% | **0.00%** |
| | **Total CVD Rate** | **9.12%** | **2.93%** |
| Canadian Solar | Aluminum Extrusions for LTAR | 0.60% | **0.00%** |
| | Solar Glass for LTAR | 3.14% | **2.64%** |
| | Electricity for LTAR | 0.54% | **0.53%** |
| | EBCP | 5.46% | **0.00%** |
| | **Total CVD Rate** | **11.59%** | **5.02%** |
| Non-Selected Companies: | **Total CVD Rate** | **10.64%**[142] | **4.22%** |

---

[142] *See Amended Final Results.*

6/25/2020

X _____

Signed by: JEFFREY KESSLER

Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance